UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARYL M. MAGDZIAK,<br><br>                                    Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>                                    Defendant. | Case No.:  3:17-cv-01367-JAH (RNB)<br><br>**REPORT AND RECOMMENDATION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**(ECF Nos. 26, 27)** |

This Report and Recommendation is submitted to the Honorable John A. Houston, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California.

On July 6, 2017, plaintiff filed a pro per Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits.  (ECF No. 1.)

Now pending before the Court and ready for decision are the parties' cross-motions for summary judgment.  For the reasons discussed hereafter, the Court recommends that plaintiff's motion for summary judgment be **DENIED**, that the Commissioner's cross-motion for summary judgment be **GRANTED**, and that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

1

## PROCEDURAL BACKGROUND

On February 19, 2014, plaintiff protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability beginning October 6, 2011.  (Certified Administrative Record ["AR"] 141-42; *see also* AR 23.)  After his applications were denied initially and upon reconsideration (AR 83-87, 90-94), plaintiff requested an administrative hearing before an administrative law judge ("ALJ").  (AR 96-97.)  An administrative hearing was held on April 19, 2016.  Plaintiff was represented by counsel and testimony was taken from him, his father, and a vocational expert.  (AR 37-63.)  At the outset of the administrative hearing, plaintiff's counsel amended plaintiff's alleged onset date to September 29, 2013, one day prior to his date last insured of September 30, 2013.  (AR 40.)

As reflected in his May 6, 2016 decision, the ALJ found that plaintiff had not been under a disability, as defined in the Social Security Act, at any time from his amended alleged onset date through his date last insured.  (AR 23-31.)  The ALJ's decision became final on June 9, 2017, when the Appeals Council denied plaintiff's request for review.  (AR 1-5.)  This timely civil action followed.

## SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520.[1]  At step one, the ALJ found that plaintiff did not engage in substantial gainful activity during the period from his original alleged onset date of October 6, 2011 through his date last insured of September 30, 2013.  (AR 25.)

---

[1] Unless otherwise indicated, all references herein to the Commissioner's regulations are to the regulations in effect at the time of the ALJ's decision.

At step two, the ALJ found that plaintiff had the following medically determinable impairments: obsessive compulsive disorder ("OCD"); anxiety; and asthma. However, plaintiff did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months. Therefore, plaintiff did not have a severe impairment or combination of impairments. (AR 25.)

Because plaintiff did not establish that he had a severe impairment or combination of impairments on or prior to his date last insured, the ALJ found that plaintiff was not disabled. (AR 30.)

## PLAINTIFF'S CLAIMS OF ERROR

In his summary judgment motion, plaintiff purported to incorporate two briefs he previously had filed in this case. (*See* ECF No. 26 at 2.) In his first brief, plaintiff made the following claims (*see* ECF No. 5 at 3-4):

1. Plaintiff is disabled due to OCD, anxiety, low Global Assessment of Functioning ("GAF") scores, and panic attacks, brought on by asthma attacks, diagnoses he has had since childhood.

2. The ALJ failed to properly consider all the factors in 20 C.F.R. § 404.1529(c)(3) in discrediting plaintiff's subjective complaints.[2]

3. The ALJ failed to give adequate weight to the medical opinion evidence.

4. The ALJ failed to provide "specific rationale" for rejecting the testimony of plaintiff's father.

---

[2] Although plaintiff also referenced 20 C.F.R. § 416.929(c)(3), that regulation applies only to applications for Supplemental Security Income ("SSI") benefits. The instant case arises solely out of the denial of plaintiff's application for disability insurance benefits.

5. The ALJ's credibility finding is not supported by substantial evidence.

6. The ALJ erred by not complying with Social Security Ruling ("SSR") 82-62 and discussing the specific mental demands of plaintiff's past work before summarily deciding that plaintiff could return to work.

7. The ALJ should have accorded controlling weight to the opinions of medical professionals who assessed low GAF scores.

8. The Appeals Council wrongly refused to consider plaintiff's appeal.

Although not enumerated in the section of his first brief where he listed his claims, plaintiff also made the following claim in the body of the brief (*see* ECF No. 5 at 11, 14):

9. The ALJ erred by not finding plaintiff disabled pursuant to the Commissioner's Listing of Impairments.

In his second brief, plaintiff made the following additional claim (*see* ECF No. 19 at 2):

10. The post-hearing determination by the Social Security Administration ("SSA") that plaintiff was disabled and entitled to receive SSI benefits should "be applied to pass through" to his application for disability insurance benefits.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of*

*Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

## DISCUSSION

Since most of plaintiff's claims are interrelated and some go to the same issue, the Court is not addressing the claims in the same order raised by plaintiff.

**A.** **Reversal is not warranted based on the ALJ's alleged failure to properly consider the opinions of his treating medical sources.**

Plaintiff's third and seventh claims of error go to the issue of whether the ALJ failed to properly consider certain medical opinion evidence.

### 1. Summary of relevant medical evidence

In 2012, the year before his amended alleged onset of disability, plaintiff saw several doctors at Vista Community Clinic for issues unrelated to his allegedly disabling impairments, including a finger injury, an eye injury after observing a welding, joint pain, concern about thyroid problems, and an ear infection. (AR 259, 295, 296, 300, 303, 307.) In July 2012, plaintiff told his treating physician, Dr. Donald Ong, that he had not had an asthma attack in a long time. (AR 303.) Treatment notes from October and November 2012 showed normal mental status findings. (AR 295, 299, 303.)

Plaintiff saw Dr. Ong again in April 2013, five months before his date last insured, complaining of a cyst in his groin for the past five years. (AR 290.) Mental status examination findings again were unremarkable. (AR 291.) Plaintiff was oriented and behaved appropriately for his age. (*Id.*) Plaintiff's only medication was Albuterol. (*Id.*)

5

On February 25, 2014, nearly five months after his date last insured, plaintiff saw Dr. Ong again. Plaintiff reporting a history of OCD and anxiety, but with only mild symptoms. (AR 287.) Plaintiff told Dr. Ong he had taken Lorazepam, most recently in 2008, and Amitriptyline, which he alleged did not work and caused dizziness. (*Id.*) On examination, plaintiff was anxious, with age-inappropriate and compulsive behavior, but he was oriented, with appropriate mood and affect, and he exhibited no agitation, anhedonia, memory loss, obsessive thoughts, or paranoia. (AR 288.) His attention span, concentration, insight, and judgment were normal. (*Id.*) Dr. Ong assessed OCD, prescribed Zoloft and Lorazepam, and referred plaintiff to a psychologist. (AR 256-58, 288.)

On April 2, 2014, plaintiff's mother took him to see Dr. Harvey Oshrin at Neighborhood Healthcare. (AR 251.) Plaintiff reported a history of chronic anxiety and excessive handwashing and alleged symptoms of panic attacks, excessive worry, obsessions, and compulsions. (AR 251-52.). However, plaintiff denied depression or mania. (AR 252.) Plaintiff said a psychologist had evaluated him once, but he had never received any psychiatric treatment, and although he had prescriptions for Zoloft and Lorazepam, he had not yet taken these medications. (*Id.*) Plaintiff said he had worked as an administrative assistant until 2006, when he was laid off, and he subsequently had worked some temporary jobs. (*Id.*) He spent his time looking for work, writing poetry, and corresponding with friends by email. (*Id.*) On examination, plaintiff presented with an anxious affect and mood, and made poor eye contact. (AR 253.) However, his memory, attention, and concentration were intact; and he showed fair judgment and insight. (*Id.*) Dr. Oshrin diagnosed OCD and assigned a current GAF score of 45. (AR 254.) He referred plaintiff to therapy and recommended follow-up in three months. (*Id.*)

Later that same month, on April 28, 2014, plaintiff saw psychologist Joseph Suozzo, at Neighborhood Healthcare. (AR 326.) When asked about current medications, plaintiff expressed wariness about making things part of the record, claiming that he had had trouble getting insurance for a preexisting condition and therefore had a gap in psychiatric

6

treatment. (*Id.*) On examination, plaintiff presented with underlying anxiety and some depressed feelings, but he was cooperative and polite, with good hygiene, linear thought process, and good eye contact. (*Id.*) Plaintiff said he was a good worker and got around his anxiety, but he was concerned that he appeared anxious in interviews and thought this might affect his ability to get a job. (AR 228, 326.) Dr. Suozzo mentioned hypnosis, but plaintiff declined due to his religious beliefs, claiming that demons could enter during the process. (AR 326-27.) Dr. Suozzo diagnosed OCD, assigned a current GAF score of 35 with a top score of 36 in the last year, and recommended relaxation and grounding techniques. (AR 326-27.)

In July 2014, after reviewing the evidence of record, Disability Determination Services (DDS) psychologist Nadine Genece found insufficient evidence to substantiate the presence of an anxiety related disorder prior to plaintiff's date last insured. (AR 68.)

Plaintiff met with psychologist Cornelia Penn on three occasions after his date last insured. The first such occasion was on August 19, 2014, more than a month after the SSA initially denied his application for disability insurance benefits. Plaintiff told Dr. Penn that he was unable to work due to anxiety and OCD. (AR 323.) He said that he had had OCD as a child but was still a good student, always on the honor roll, and that he had held two long-term jobs as an administrative assistant after graduation. (AR 322-23.) He reported his strengths as being intelligent and friendly. (AR 323.) On examination, plaintiff presented with an anxious mood and affect, but adequate grooming, fluent speech, and intact comprehension. (*Id.*) Dr. Penn diagnosed OCD and panic disorder, assigned a GAF score of 50, and told plaintiff to return in two weeks. (AR 324.)

In October 2014, after reviewing the evidence of record, DDS psychologist Heather Barrons found insufficient evidence to find any limitations prior to the date last insured. (AR 77-78.) Dr. Barrons noted that there was no medical evidence that related to the alleged period of disability prior to the date last insured and that plaintiff's subjective claims were not consistent with the evidence, as plaintiff had no consistent treatment and

contrary to a third-party report that he was unable to go outside, evidence showed that he shopped in stores. (*Id.*)

Plaintiff saw Dr. Penn a second time on October 17, 2014, two months after his first visit and nine days after the SSA denied his benefits application on reconsideration. Plaintiff reported increased isolation over the past few years, claiming that he was even avoiding part-time work and services at Kingdom Hall, and stating that he had difficulty leaving the house due to OCD and anxiety. (AR 319.) On examination, plaintiff presented with an anxious mood and affect, and pressured, rapid speech. However, he had fair insight and judgment, and logical thought processes. (*Id.*) Dr. Penn encouraged increased activity to combat symptoms of anxiety, and she suggested that plaintiff consider medication. (AR 319-20.) Plaintiff agreed to participate in weekly church services, spend extra time at the grocery store, and consider seeing a psychiatrist in the future. (AR 319.)

Plaintiff met with Dr. Penn a third time more than two months later, on January 6, 2015. Plaintiff reported he was still anxious about coming to the session, driving, and parking, although slightly less so. (AR 317.) Plaintiff mentioned the loss of a friend. (*Id.*). Dr. Penn encouraged plaintiff to leave the house daily and to volunteer at a library or senior center; however, plaintiff was reluctant, claiming he did not want to be asked to lift things given his "weak abdominal wall." (*Id.*) Plaintiff believed he had been terminated from his last job of three years after refusing to lift a box. (*Id.*) On examination, plaintiff presented with an anxious mood, but findings on mental status examination were otherwise normal. (AR 317-18.) Plaintiff was oriented, with intact comprehension and linear, concrete thought process. (*Id.*)

On March 9, 2016, one month before the administrative hearing, Dr. Penn completed a medical impairment questionnaire, at the request of plaintiff's lawyer. (AR 310-15.) She wrote that she had seen plaintiff on just three occasions – in August 2014, October 2014, and January 2015. (AR 310.) Diagnoses included OCD and panic disorder. (*Id.*) Dr. Penn indicated that the focus of the three sessions was to decrease plaintiff's anxiety related to therapy. (*Id.*). Dr. Penn opined that plaintiff had serious to no useful ability to function in

3:17-cv-01367-JAH (RNB)

multiple areas, including the mental aptitudes and abilities needed to do unskilled work. (AR 312.)

At the April 19, 2016 administrative hearing, plaintiff's attorney acknowledged that plaintiff did not start seeing a psychologist until well after his date last insured. He further acknowledged that the psychologist (Dr. Penn) had declined to opine as to the onset of plaintiff's allegedly disabling conditions, as she had not treated plaintiff during 2013. (AR 41-42.) Nonetheless, citing SSR 83-20,[3] the attorney argued that the ALJ should infer from the current evidence that plaintiff was disabled as of September 29, 2013. (AR 42.)

### 2. Law applicable to consideration of medical opinion evidence

Under the Commissioner's regulations, an ALJ must consider all medical source opinions based on the factors outlined in 20 C.F.R. § 404.1527. These factors include the length of the treatment relationship and the frequency of examination, supportability, consistency with the record as a whole, and other factors such as the medical source's familiarity with social security disability programs and their evidentiary requirements. *Id.*

---

[3] As noted by the Commissioner, SSR 83-20 (Onset of Disability) (rescinded on October 2, 2018 and replaced by SSR 18-1p and SSR 18-2p) provides guidance on how to establish disability onset date in an individual found disabled. Thus, if the ALJ had found that plaintiff was disabled and that the medical evidence was not definite as to the onset date, SSR 83–20 would have required that the ALJ enlist a medical expert to assist in drawing inferences from the record to determine a remote date of onset. *See Armstrong v. Comm'r of Soc. Sec. Admin.,* 160 F.3d 587, 590 (9th Cir.1998); *DeLorme,* 924 F.2d at 848. Here, however, the ALJ determined that plaintiff was not disabled prior to the expiration of his insured status. Accordingly, the need for a medical expert to assist in inferring an onset date did not arise. *See Sam v. Astrue,* 550 F.3d 808, 810 (9th Cir.2008) ("Because the ALJ found that Sam was not disabled ..., the question of *when* he became disabled did not arise and the procedures prescribed in SSR 83-20 did not apply."); *see also Lair-Del Rio v. Astrue*, 380 F. App'x 694, 696 (9th Cir. 2010) (requirement to call a medical expert under SSR 83-20 "only applies where a claimant has been found disabled"); *Blair–Bain v. Astrue*, 356 F. App'x 85, 88 (9th Cir. 2009) (where the ALJ found the claimant "not disabled prior to the last date insured, we have no cause to remand under SSR 83-20"); *DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 175-76 (9th Cir. 2009) (same).

The Ninth Circuit has held that a treating physician's opinions are entitled to special weight because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2).

If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); *Baxter v. Sullivan*, 923 F.3d 1391, 1396 (9th Cir. 1991). Where a treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record. *See, e.g., Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007); *Magallanes*, 881 F.2d at 751; *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Here, to the extent plaintiff implicitly is contending that his treating sources rendered any opinions to the effect that plaintiff had a severe medically determinable impairment prior to the expiration of his insured status, those opinions were controverted by the opinion of the State agency physician, Dr. Barrons, that there was insufficient evidence to find any limitations prior to plaintiff's date last insured. (*See* AR 77-78.)

### 3. Analysis

For the reasons discussed hereafter, the Court finds that reversal is not warranted based on the ALJ's alleged failure to properly consider the opinions of plaintiff's treating medical sources.

Plaintiff contends that the ALJ mischaracterized primary care practitioner Dr. Ong's full findings at his February 25, 2014 appointment.  (*See* ECF No. 5. at 4-5.)  The Court disagrees.  The ALJ discussed Dr. Ong's findings from plaintiff's February 24, 2014 appointment, noting that plaintiff had reported the symptoms as "mild."  (*See* AR 27, citing AR 287.)  While plaintiff maintains that this is misleading, as he was a "new patient to Dr. Ong" (*see* ECF No. 5 at 5), the record reflects otherwise.  Plaintiff had seen Dr. Ong on several occasions in 2012 and 2013, prior to his date last insured, for other issues unrelated to any mental impairments.  The 2012 and 2013 treatment records for those appointments documented normal mental status findings.  (*See* AR 291, 295, 299, 303.)  While Dr. Ong did characterize plaintiff's mood at as "anxious" and did indicate that plaintiff's behavior was "inappropriate for age" and "compulsive" in the treatment notes for the February 25, 2014 appointment, Dr. Ong also made the following "normal" findings:

> "Orientation - Oriented to time, place, person & situation. No agitation. No anhedonia. Appropriate mood and affect.  Sufficient fund of knowledge. Sufficient language. Patient is not in denial. Not euphoric. Not Fearful. No flight of ideas. Not forgetful. No grandiosity. No hallucinations. Not hopeless.  Appropriate affect. No increased activity. No memory loss. No mood swings. No obsessive thoughts. Not paranoid. Normal insight Normal judgment Normal attention span and concentration. No pressured speech. No suicidal ideation."  (AR 288.)

In any event, Dr. Ong's mere diagnosis of anxiety and OCD at the February 25, 2014 appointment, unaccompanied by any opinion about any specific functional deficits, was insufficient to establish that plaintiff had a severe mental impairment.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164-65 (9th Cir. 2008) (at step two, ALJ did not err in failing to classify carpal tunnel syndrome as a severe impairment where the medical record did not establish work-related limitations); *see also, e.g.*, *Youngblood v. Berryhill*, 734 F. App'x 496, 498 (9th Cir. 2018) ("An ALJ does not err by not incorporating a physician's opinion when the physician had not 'assign[ed] any specific limitations on the claimant.'" (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223

(9th Cir. 2010)); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (ALJ not required to credit medical evidence that did not show how a claimant's symptoms "translate into specific functional deficits which preclude work activity").

### (b)    Dr. Penn's March 9, 2016 opinion (AR 310-15)

Plaintiff further contends that the ALJ erred when he gave "little weight" to Dr. Penn's opinions as reflected in the medical source statement dated March 9, 2016.  (See ECF No. 5 at 6, 8, 10-11.)

The Court disagrees because the ALJ did provide several specific and legitimate reasons for according little weight to Dr. Penn's March 9, 2016 opinions and impressions.

First, the ALJ noted that Dr. Penn's opinions and impressions were not supported by (a) Dr. Penn's own objective findings, including that plaintiff had no psychotic symptoms, had logical thoughts, was oriented, had intact comprehension and normal eye contact, and (b) the evidence of record that plaintiff retained activities of daily living including the ability to go out on his own and to Walmart-type stores on a regular basis.  (*See* AR 29, citing AR 190, 191, 317, 318, 319.)  Dr. Penn's opinions and impressions also were inconsistent with plaintiff's own representation that he was a "good worker and gets around the anxiety."  (*See* AR 29, citing AR 326).  *See* 20 C.F.R. § 404.1527(c)(4) (an opinion's consistency with the record a whole is considered in the evaluation of medical opinions); *Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discount treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings).

Most importantly, the ALJ explained that Dr. Penn's opinions applied only to the period after the expiration of plaintiff's insured status.  The ALJ noted in this regard that evidence in February 2014 (still after but closer in time to the date last insured) showed plaintiff had only complained of mild anxiety.  (AR 29-30, citing AR 287.)  Dr. Penn had not even purported to render an opinion about plaintiff's limitations on or prior to his date last insured.  Indeed, at the April 19, 2016 administrative hearing, plaintiff's counsel

acknowledged that he had asked Dr. Penn for an opinion as to the onset date of plaintiff's disabling condition and that Dr. Penn had "deferred" because she "hadn't seen him in a while and had not seen him back in 2013." (*See* AR 43.)

### (c)    Plaintiff's GAF scores (AR 254, 324, 326-27)

Plaintiff also contends that the ALJ erred by failing to give "controlling weight" to the GAF score of 45 assessed by Dr. Oshrin on April 2, 2014, the GAF score of 35 assessed by Dr. Suozzo on April 28, 2014, and the GAF score of 50 assessed by Dr. Penn on August 19, 2014. (See ECF No. 5 at 6, 7.)

A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* ("DSM") 34 (4th ed., 2002 rev.). A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning," such as an inability to keep a job. *Id.* However, GAF scores are not opinions of an individual's functional abilities; they are snapshot assessments used to plan and measure the impact of treatment. *See id.* at 32-33. Moreover, GAF scores are not directly correlative to Social Security severity assessments. *See* 65 Fed. Reg. 50746, 50764-65 (August 21, 2000). Indeed, the GAF scale was eliminated from the fifth edition of the DSM. The DSM no longer recommends using GAF scores to measure mental health disorders because of the scores' "conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Olsen v. Commissioner*, 2016 WL 4770038, at *4 (D. Or. Sept. 12, 2016) (quoting DSM 16 (5th ed. 2013)); *see also Sherod v. Saul*, 2019 WL 3205796, at *4 (C.D. Cal. July 16, 2019).

Here, the ALJ explained that he was according "little weight" to the GAF score of 45 assessed by Dr. Oshrin in April 2014, well after the expiration of plaintiff's date last

insured, because it was not supported by Dr. Oshrin's own objective findings including that plaintiff had no concentration or memory problems and was oriented. Nor was it supported by Dr. Oshrin's recommendation that plaintiff follow up in three months, suggesting no urgent need for psychiatric services. (*See* AR 27, citing AR 253, 254.) The ALJ also noted that plaintiff's initial presentation to Dr. Oshrin was characterized as "mild," and that "there [was] no sustained symptomatology or pathology lasting or expected to last for any continuous period of at least 12 months during the period at issue that [was] consistent with more than minimal limitations." (AR 27-28.)

The ALJ further explained that he was according little weight to the other assessed GAF scores in plaintiff's therapy records in the 30s, 40s, and low 50s because (a) the evidence showing no significant and persistent cognitive deficits or psychotic symptoms did not support GAF scores in those ranges, and (b) those scores did not "speak" to the period at issue. (AR 28.)

Since the ALJ did state specific and legitimate reasons for according little weight to the assessed GAF scores, the Court finds that reversal is not warranted based on the ALJ's failure to give "controlling weight" to those scores.

**B.** **Reversal is not warranted based on the ALJ's alleged failure to properly consider plaintiff's subjective symptom testimony.**

Plaintiff's second and fifth claims of error go the same issue, namely whether the ALJ failed to properly consider plaintiff's subjective symptom testimony.

1. Plaintiff's subjective symptom testimony

In a Function Report completed in June 2014, plaintiff represented that he was unable to work because it took him a long time to get ready for his day, he was tired at work, and he experienced anxiety, panic attacks, tinnitus, retinopathy, sensitivity to light, distraction around other people, and diarrhea caused by the Motrin he took for a broken tailbone and trigger finger. (AR 187.) He made his own simple meals, and occasionally

fried something or made omelets; he did not like to touch meat because it felt dirty. (AR 189.) He cleaned and vacuumed his bedroom, but otherwise did not like to clean. (*Id.*) He did a little yard and house work. (AR 190.) He could drive, and occasionally shopped for food, clothes, and personal care items, going out for two to three hours at a time but returning home quickly to use the toilet. (*Id.*) He shopped for groceries and went to "Walmart-type stores" only. (AR 191.)

Plaintiff claimed that he was agitated and irritated because he was in constant pain from headaches and bodily discomfort. (AR 192.) He represented that he could walk only 100 feet before his side hurt, and he could resume walking only after using an inhaler. (*Id.*) He listed his medications as Albuterol, Motrin, Lorazepam, and Zoloft – indicating that he had taken Lorazepam in the past and might need it again, and that Zoloft had been prescribed and he might need to take it soon. (AR 194.) Plaintiff said he used to be more active in his religion and attend meetings three days a week, occasionally speaking in front of an audience and answering questions. (AR 197.) He no longer attended meetings or spoke from the stage, but he did volunteer writing services one hour a month. (*Id.*) He used to weave yarn bracelets and create mazes or poems. (*Id.*) He still occasionally wrote poetry and read about music, but he stopped braiding yarn bracelets because it hurt his finger. (AR 191, 197.) Plaintiff claimed that he was cooperative and well-liked by others, and he denied any work-related issues due to difficulty getting along with others. (AR 193.)

At the administrative hearing, plaintiff testified that he was born in 1979, graduated from high school, and previously worked as an administrative assistant. (AR 50.) He generally found work through temporary agencies, and he was occasionally hired full-time after temporary assignments. (*Id.*) He last worked in October 2011, when he was laid off from a temporary assignment. (AR 50-51.) Plaintiff claimed that he had taken Lorazepam in the past for anxiety or OCD, but he took it primarily for ringing in his ears. (AR 52.) It helped somewhat, but left him groggy the next day at work, and he thought it caused him to make mistakes at work that were noticeable to employers. (AR 53.)

Plaintiff first saw a psychiatrist in 2014, because he was considering antidepressant medication, and wanted some "talk therapy." (AR 54.) He said he waited until 2014 because he "wanted to continue working" and was "trying not to pursue disability," but his problems were getting worse and he thought he "better try to do something about it." (AR 54.) Between September 2014 and 2015, he saw Dr. Suozzo just once and Dr. Penn four or five times. (AR 54, 62.) Dr. Penn recommended volunteer work. However, plaintiff declined because the job might involve lifting boxes and he found it hard to lift over 20 pounds; also, he did not want to be apologetic for his inability to do things, even in a volunteer position. (AR 55.) When prompted, plaintiff added that he might have difficulties in a volunteer position because of his OCD and his frequent hand washing. (AR 56.) Plaintiff said that, after a few appointments with Dr. Penn, he rescheduled or cancelled all appointments thereafter, first attributing it to the Dr. Penn's failure to be forthcoming, and subsequently attributing it to anxiety and stress. (AR 57.) Plaintiff claimed he was afraid to leave the house and went out just once a week. (*Id.*) To fill his time, he used the computer, listened to music, and e-mailed people. (AR 58.) When asked whether he could sustain a temporary administrative assistant job for a three-month assignment, plaintiff testified that he did not know, as it had taken him a very long time to get ready that day and he had been very close to being late for work in the past because of local traffic. (AR 60.)

### 2.    Law applicable to consideration of subjective symptom testimony

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." *See Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986). Under the "*Cotton* standard," where the claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce some degree of pain and/or other symptoms, and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes

specific findings stating clear and convincing reasons for doing so. *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986); *see also Smolen*, 80 F.3d at 1281; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991).

Here, in his decision, the ALJ succinctly synthesized plaintiff's subjective symptom testimony as follows:

> "The claimant alleged he is unable to perform or sustain all work activity due to breathing problems, anxiety, panic attacks, phobias about hygiene and cleanliness, excessive cleaning rituals, fear of illness, isolative behaviors, poor memory and concentration, distractibility, and difficulty having contact with others due to his fears that limit his abilities to sit, stand, walk, lift and carry, perform postural movements and other activities, understand, remember and complete tasks and interact with others." (AR 26.)

The ALJ then stated:

> "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms; however, plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 26-27.)

3. <u>Analysis</u>

The ALJ articulated multiple reasons in support of his adverse credibility determination.

Among other reasons, the ALJ found that the objective medical evidence did not support plaintiff's subjective allegations of disability prior to his date last insured. (AR 27.) Objective medical evidence "is a useful indicator" to assist in making "reasonable conclusions" about the intensity and persistence of symptoms and the effect of those symptoms on an individual's ability to work. *See* 20 C.F.R. § 404.1529(c)(2). Although plaintiff had a history of OCD and anxiety since childhood, findings on mental status examinations during 2012 and 2013 were largely unremarkable. (*See* AR 291, 295, 299, 303.) Even after plaintiff's date last insured, clinicians noted only mild anxiety and some

inappropriate compulsive behavior, which was not consistent with the disabling level of impairment alleged by plaintiff. (*See* AR 27, citing AR 253, 287-88.) Since the lack of objective support was not the sole basis for the ALJ's adverse credibility determination, the Court finds that it was a legally sufficient reason on which the ALJ could properly rely. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); *Morgan*, 169 F.3d at 600 (ALJ may properly consider conflict between claimant's testimony of subjective complaints and objective medical evidence in the record); *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ may properly rely on weak objective support for the claimant's subjective complaints); *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (ALJ may properly rely on lack of objective evidence to support claimant's subjective complaints); *see also*

In not crediting plaintiff's allegations of disabling symptoms, the ALJ also considered plaintiff's course of treatment, which the ALJ noted was not the type of treatment one would expect from a totally disabled individual. (AR 28.) See 20 C.F.R. § 404.1529(c)(3)(v) (course of treatment is properly considered when evaluating symptoms). In this regard, the ALJ noted that plaintiff did not receive consistent mental health treatment prior to or even after his date last insured. (*See* AR 27-28, citing AR 252.) In April 2014, plaintiff told Dr. Oshrin that he had never received any psychiatric treatment. (*See* AR 252.) Plaintiff maintains that he did not seek psychiatric treatment until April 2014 because prior to that, his insurance premium would increase every time he went to the doctor, so he went "only when dire." (*See* ECF No. 5 at 9.) However, the Court concurs with the Commissioner that the fact that plaintiff sought treatment for such things in 2012 and 2013 as an ear infection, an eye problem, joint pain, cysts, and thyroid concerns -- issues that plaintiff does not allege to be disabling – suggests that plaintiff did not think that his mental impairments were sufficiently severe during that time frame to warrant any medical attention. Accordingly, the Court finds that this reason also constituted a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility

determination. *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (in assessing credibility, an ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment); *Tommassetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (same); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (same).

The ALJ also noted that plaintiff had not been entirely compliant in taking prescribed medications, which suggested that his symptoms might not have been as limiting as he was alleging. By way of example, the ALJ noted that plaintiff had been prescribed Zoloft and Lorazepam, but he had never even filled those prescriptions. (*See* AR 28, citing AR 252.) Plaintiff criticizes the ALJ's findings regarding medications, stating that he took Lorazepam in 2006 and other medications before 2008, and he did not like them, because they caused sleepiness and interfered with his ability to work. (*See* ECF No. 5 at 8-9.) However, plaintiff's treatment records document no attempts to try the medications prescribed by Dr. Ong on February 25, 2014; nor do they treatment records show that plaintiff ever experienced any side effects of medications during the relevant time period. *See Miller v. Hecker*, 770 F.2d 845, 849 (9th Cir. 1985) (medication side effects must be medically documented in order to be considered). Under the same authorities cited above, plaintiff's non-compliance in taking prescribed medications also constituted a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.

The ALJ also noted that plaintiff's daily activities were not consistent with the level of impairment alleged. Specifically, the ALJ noted that plaintiff exercised 2 to 3 days a week despite his fear of germs, looked for work, prepared some meals, drove a car, was able to go out alone, shopped in stores, and went to grocery and Walmart-type stores on a regular basis despite his allegations that he was uncomfortable around others. (AR 28.) *See* 20 C.F.R. 404.1529(c)(3)(i). The Court finds that this reason also constituted a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination. *See Berry v. Astrue*, 622 F.3d 1228, 1234-35 (9th Cir. 2010) (evidence that

claimant's self-reported activities suggested a higher degree of functionality than reflected in subjective symptom testimony adequately supported adverse credibility determination); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (evidence that claimant exercised and undertook projects suggested that claimant's later claims about the severity of his limitations were exaggerated); *Orn*, 495 F.3d at 639 (evidence of daily activities may form basis of an adverse credibility determination where it contradicts the claimant's other testimony)

The ALJ also identified other inconsistencies in plaintiff's representations. Despite his claimed inability to work, the record showed that he collected unemployment and continued to look for work after the alleged onset date. (AR 28, citing AR 143, 252.) *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) (claimant's subjective symptom testimony was belied by evidence that she recently worked and sought out other employment); *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988) (ALJ properly found claimant not credible when he apparently considered himself capable of work and held himself out as available for work).

The ALJ also noted that there was evidence that plaintiff did not stop work for reasons related to his allegedly disabling OCD impairments. (AR 29.) Plaintiff said he left his administrative assistant position because he was laid off, and claimed he was let go from his last job after he refused to lift a box. (*Id.*, citing AR 252, 317.) *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ properly considered that claimant was out of work because he was laid off and not because of his allegedly disabling injuries). Elsewhere in the record, plaintiff represented that he could not perform volunteer work primarily because of his "weak abdominal muscles" and difficulty lifting heavy weights, even though there is no medical documentation of this in the record. (AR 55, 196, 317.) Plaintiff criticizes the ALJ's finding that he was looking for work, claiming that he had no choice, as this was required of him, and asserting that this did not prove he could work even if he were hired. (See ECF No. 5 at 8.) Regardless of whether plaintiff could perform

the job if hired, the ALJ found that plaintiff's representations were inconsistent with his alleged inability to work in any capacity.  (*See* AR 28.)

**C.**   **Reversal is not warranted based on the ALJ's alleged failure to properly consider the testimony of plaintiff's father.**

1.   Plaintiff's father's testimony

The Administrative Record includes a Third-Party Function Report completed by plaintiff's father in June 2014, describing plaintiff's cleaning rituals and difficulty leaving the house.  (*See* AR 171-79.)  Plaintiff's father indicated that in addition to engaging in personal care and frequent hand washing, plaintiff spent time complaining about his parents and their habits, surfing the computer, and watching television.  (AR 172, 175.)  He stated that plaintiff was able to tend to personal care, but it took an extraordinary amount of time due to plaintiff's compulsions and frequent bouts of diarrhea caused by anxiety and pain medications.  (AR 172.)  Plaintiff was able to drive and go out alone, and he went outside one or two times a week for one or two hours at a time, to shop for snack items, clothing, and personal care products.  (AR 174.)  Plaintiff previously had been active in religious activities and he occasionally went to the movies or restaurants with friends.  (AR 176.)

Plaintiff's father also was a witness at the administrative hearing.  He testified that plaintiff had lived with him for 35 years, his whole life.  (AR 44.)  When asked why plaintiff did not start getting treatment until early 2014 and has not had any treatment subsequent to January 2015, the father testified that plaintiff was "afraid, too anxious to even go out the door," and that he did not like to drive and was afraid of the parking area in the facility.  (*Id.*)  Nonetheless, when plaintiff had some money, he would leave the house up to five or six times a month.  (AR 48.)  He drove himself to get a haircut or personal items, such as snacks or grooming items.  (AR 48-49.)  Plaintiff showered for more than an hour at a time, and he would not eat without first washing his hands five or six times.  (AR 45.)  He covered his plate or put it in the microwave when he was not eating, and he rarely came into the kitchen because he was afraid he might see something

that would bother him." (*Id.*) Plaintiff's father stated that plaintiff had been this way since 2000, but it had gotten worse. (AR 46, 49.) Plaintiff's father acknowledged that plaintiff had been able to work for many years, but maintained that it was with much "difficulty," "agitation," and "nervousness." (AR 46.) When plaintiff had worked for a company that offered employees an incentive trip to Hawaii, plaintiff repeatedly had told his father that he did not want to go to Hawaii. (AR 47.)

According to plaintiff's father, plaintiff had tried different medications, including Amitriptyline during the 1990s and Lorazepam during the early 2000s, but he was afraid of medications. (AR 47.) Plaintiff's mother was "against medication as well." (*Id.*) A doctor prescribed Zoloft, but plaintiff never filled the prescription. (*Id.*) He corresponded with friends by e-mail and on the internet, but otherwise he was "socially a hermit." (AR 49.)

### 2.   Law applicable to consideration of lay witness testimony

The Commissioner's regulations require that, in determining whether a claimant is disabled, the ALJ consider *inter alia* statements provided by nonmedical sources such as family members about the severity of the claimant's impairments and how the impairments and any related symptoms affect the claimant's ability to work. *See* 20 C.F.R. §§ 404.1513(d), 404.1529(a).

Further, the case law is well-established in this Circuit that lay witness testimony as to how a claimant's symptoms affect the claimant's ability to work is competent evidence and cannot be disregarded without providing specific reasons germane to the testimony rejected. *See, e.g., Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *Smolen*, 80 F.3d at 1288-89; *Dodrill*, 12 F.3d at 919.

### 3.   Analysis

Plaintiff contends that the ALJ committed reversible error in failing to provide "specific rationale" for rejecting his father's testimony. (*See* ECF No. 5 at 4.) However,

contrary to plaintiff's characterization, the ALJ did provide reasons germane to his father's testimony for according it "little weight."

First, the ALJ noted that most of what the father reported was based on what plaintiff told him or displayed for him, and that plaintiff's allegations were not fully consistent with the evidence of record as discussed elsewhere in the decision. (*See* AR 29.) The Court already has found that the ALJ stated legally sufficient reasons in support of his adverse credibility determination with respect to plaintiff's subjective symptom testimony. It follows that the ALJ's legally sufficient reasons for rejecting plaintiff's subjective symptom testimony also constituted legally sufficient reasons for rejecting plaintiff's father's lay witness testimony. *See Valentine*, 574 F.3d at 694 ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ gave germane reasons for rejecting her testimony."); *see also Molina*, 674 F.3d at 1122 (even where ALJ completely failed to discuss lay witness testimony, "given that the lay witness testimony described the same limitations as Molina's own testimony, . . . the ALJ's reasons for rejecting Molina's testimony apply with equal force to the lay testimony").

Second, the ALJ noted that, while it was understandable and commendable that plaintiff's father would support his claim for disability, the father's statements were clearly contradicted by the objective evidence of record and other factors discussed in the decision. (*See* AR 29.)[4] As the Commissioner points out by way of example, plaintiff's father testified that plaintiff did not have medical treatment before his date last insured because he was too afraid and anxious to go out the door (AR 44); yet plaintiff's father also testified that plaintiff left home five or six times a month to purchase snacks or get a haircut (AR

---

[4] An ALJ may dismiss lay witness testimony with germane reasons supported by evidence discussed "at other points in his decision" even if the ALJ "did not clearly link his determination to those reasons." *See Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

23

48). Moreover, during 2012 and 2013, while plaintiff was still insured for purposes of disability insurance benefits, plaintiff met with doctors at Vista Community Clinic for issues unrelated to his allegedly disabling impairments, including a finger injury, an eye injury after observing a welding, joint pain, concern about thyroid problems, and an ear infection (AR (AR 259, 295, 296, 300, 303, 307). Treatment notes from this time period showed normal mental status findings. (*See* AR 291, 295, 299, 303.) The Ninth Circuit has held that inconsistency with medical evidence constitutes a legitimate reason for discrediting the testimony of lay witnesses. *See Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis*, 236 F.3d at 511.[5]

The Court therefore finds that reversal is not warranted based on the ALJ's alleged failure to properly consider the testimony of plaintiff's father.

---

[5] The Court is mindful that the Ninth Circuit also has held that it is error for the ALJ to reject the testimony of family members because the claimant's medical records did not corroborate their statements about the claimant's alleged symptoms and pain. *See Smolen*, 80 F.3d at 1289; *see also Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011); *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009). Courts have reconciled these two lines of cases by concluding that an ALJ may reject lay testimony that is affirmatively inconsistent with the medical evidence (under the *Vincent* line of cases), but that the ALJ may not reject lay testimony merely because of lack of objective medical support (under the *Smolen* line of cases). *See Rivera v. Colvin*, 2013 WL 6002445, at *2-*4 (D. Or. Nov. 12, 2013) (explaining that an ALJ may reject lay witness testimony based on "affirmative contradictory evidence in the medical record, not absence of supporting evidence"); *see also Grisel v. Colvin*, 2014 WL 1315894, at *14 (C.D. Cal. Apr. 2, 2014); *Atwood v. Astrue*, 742 F. Supp. 2d 1146, 1152 (D. Or. 2010); *Staley v. Astrue*, 2010 WL 3230818, at *19 (W.D. Wash. July 27, 2010). Here, the Court finds that the *Vincent* line of cases is controlling because plaintiff's father's statements about the severity of plaintiff's mental impairments, to the extent they even applied to the relevant time period (*i.e.*, the period on or before September 30, 2013), were contradicted by the treatment notes from that time period showing normal mental status findings.

## D. The ALJ's step two determination is supported by substantial evidence and free of legal error.

Plaintiff's first claim, which is premised on the contention that plaintiff is disabled, goes to the issue of whether the ALJ's determination that plaintiff was not disabled at step two of the Commissioner's sequential evaluation process is supported by substantial evidence and free of legal error.

Plaintiff contends that he is disabled because he has had diagnoses of OCD, anxiety, and asthma since he was a child, which caused him to struggle in work and social settings. (*See* ECF No. 5 at 3.) However, the fact that plaintiff may have been diagnosed with OCD, anxiety, and asthma as a child and the fact that these impairments may have caused some difficulties in school and social settings are not sufficient to establish that he had any severe impairments prior to the expiration of his insured status. *See Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999) (although claimant clearly experienced various impairments, no evidence supported a finding that those impairments were severe). An impairment is severe only if it significantly limits an individual's ability to perform work-related functions. 20 C.F.R. § 404.1522 (emphasis added). Work-related functions include mental functions, such as the ability to understand, carry out, and remember simple instructions; use judgment; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. 20 C.F.R. § 405.1521(b)(3)-(6). Here, as the ALJ noted, although clinicians occasionally noted OCD behaviors in plaintiff as a child, plaintiff was nonetheless an excellent student, able to graduate from high school with honors and work for several years thereafter, with substantial earnings. (*See* AR 27, citing AR 50, 150, 241, 244, 252, 323, 329.) There are no medical records showing that plaintiff pursued ongoing treatment for his mental impairments prior to his date last insured. Indeed, plaintiff told Dr. Oshrin on April 2, 2014 that he had never received any psychiatric treatment. (*See* AR 252.) And, there is no medical evidence of record establishing that plaintiff's mental impairments significantly limited his ability to perform work-related functions prior to his date last insured.

Plaintiff further contends that he refilled asthma medications "over and over" since he was a child, for "breathing attacks that came on due to panic and anxiety, caused by school work and then work in my adult life." (*See* ECF No. 5 at 8.) However, as the ALJ noted, while plaintiff's childhood records do show that plaintiff was diagnosed with asthma and used an Albuterol inhaler as needed, there is no medical evidence showing that the asthma caused significant work-related limitations. (AR 28).[6] In fact, plaintiff's childhood doctor specifically found that asthma was "not a real problem." (*See* AR 244-45.) Moreover, as the ALJ noted, plaintiff represented in October 2012 that he had not had an asthma attack in a long time. (*See* AR 28, citing AR 302.) Further, physical examination generally documented normal respiratory effort. (*See* AR 282, 303). Thus, the record does not show that plaintiff's asthma significantly limited his ability to perform work-related functions.

Even evidence dated after the date last insured supports the ALJ's finding that plaintiff's medically determinable impairments were nonsevere as of September 30, 2013. Plaintiff testified that in 2014, he wanted to continue working, but his problems were getting worse and he thought he should do something about it. (*See* AR 54.) This suggests that as of September 30, 2013, when plaintiff's insured status expired, his problems were not yet at a level that he thought warranted medical attention. In February 2014, when plaintiff first saw a doctor about anxiety, he reported his symptoms as mild. (*See* AR 287.) At an initial psychiatric examination in April 2014, concurrent with plaintiff's application for disability insurance benefits, a clinician noted that plaintiff was oriented and had no concentration or memory problems, with no documentation of sustained symptomology or pathology. (*See* AR 326-27). The Court therefore concurs with the ALJ that record does not show that Plaintiff's mental impairments significantly limited his ability to perform work-related functions prior to his date last insured.

---

[6] Curiously, when he applied for disability and was asked to list all of the conditions that limited his ability to work, Plaintiff did not mention asthma (AR 163).

The ALJ's step two finding also is supported by application of a special technique set forth in the regulations for evaluating whether mental impairments are severe. *See* 20 C.F.R. § 404.1520a. Under this technique, the Commissioner determines the extent to which a medically determinable mental impairment or impairments results in functional limitations in four broad areas – daily activities; social functioning; concentration, persistence, or pace; and episodes of decompensation. Under this analysis, the ALJ found that plaintiff had mild limitations in activities of daily living. (AR 30.) The ALJ noted in this regard that plaintiff exercised two to three days per week, looked for work, prepared some meals, drove a car, was able to go out alone, shopped in stores, and went to grocery and Walmart-type stores on a regular basis, despite allegations of discomfort around others. (*Id.*, citing AR 174, 287.) In the area of social functioning, the ALJ found that plaintiff had mild limitations. (AR 30.) Despite an anxious presentation, plaintiff was pleasant, friendly, and able to interact in socially appropriate ways. He did not have significant difficulty interacting with others in stores. (*Id.*, citing AR 244, 323.) Indeed, the Court notes that, in his June 2014 Function Report, plaintiff represented that he was cooperative and well-liked, and he denied any work-related issues due to difficulty getting along with others. (*See* AR 193.) Moreover, at his August 19, 2014 appointment with Dr. Penn, plaintiff cited "being friendly" as one of his strengths. (*See* AR323.) In the area of concentration, persistence, or pace, the ALJ found that plaintiff had mild limitations. (AR 30.) As the ALJ noted, there is little to no objective medical evidence of any memory or concentration problems, and mental status examinations showed intact memory, attention, and concentration. (*See id.*, citing AR 323; *see also* AR 253, 288, 291, 317-18, 319.) Plaintiff himself had characterized his OCD symptoms as "mild" at his appointment with Dr. Ong on February 25, 2014, nearly five months after his insured status expired. (*See* AR 287.) Finally, the ALJ found that plaintiff had experienced no episodes of decompensation of extended duration. (AR 30.) Because plaintiff's impairments caused no more than mild limitations in any functional area, the ALJ properly found that the impairments were nonsevere, consistent with the regulations. *See* 20 C.F.R. §

404.1520a(d)(1); *see also Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012) (ALJ's non-severity determination as to mental impairments was supported by the record evidence where ALJ made specific findings and discussed evidence as to the degree of limitation in each functional area).

**E.**     **Reversal is not warranted based on the ALJ's failure to find plaintiff disabled pursuant to the Commissioner's Listing of Impairments.**

Plaintiff appears to be contending that the ALJ should have found him disabled pursuant to the Commissioner's Listing of Impairments, and specifically the listings for mental impairments.  (*See* ECF No. 5 at 11, 14.)

At step three of the Commissioner's five-step sequential evaluation process, the ALJ must determine whether a claimant's impairment or combination of impairments meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, where the Commissioner has set forth certain impairments that are presumed to be of sufficient severity to prevent the performance of work.  See 20 C.F.R. § 404.1525(a); *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  Here, based on his finding at step two of the sequential evaluation process that plaintiff was not disabled on or prior to his date last insured, there was no need for the ALJ to proceed to step three.  *See* 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.").  Thus, this claim of error is meritless.

**F.**     **Reversal is not warranted based on the ALJ's failure to discuss the specific mental demands of plaintiff's past work or plaintiff's adaptability to other work.**

Plaintiff's sixth claim is that the ALJ committed reversible error by not complying with SSR 82-62 (A Disability Claimant's Capacity to Do Past Relevant Work).  (*See* ECF No.5 at 4.)  SSR 82-62 addresses the Commissioner's responsibilities at step four of the

sequential evaluation process, when the ALJ compares the claimant's residual functional capacity to the demands of his past work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). Here, as noted above, based on his finding at step two that plaintiff was not disabled on or prior to his date last insured, there was no need for the ALJ to proceed to any of the remaining steps, including step four. The Court therefore concurs with the Commissioner that this claim of error is meritless.

Plaintiff also contends that the ALJ erred by not complying with SSR 83-14 (The Medical Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments) and SSR 85-15 (The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments) by citing examples of specific occupations plaintiff could perform, or otherwise show that other work exists that he could perform. According to plaintiff, this was required by 20 C.F.R. §§ 404.1512(f) and 404.1560(c). (*See* ECF No. 5 at 6-8.) However, the assessment whether an individual can adjust to other work is made at step five of the Commissioner's sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1560(c). Since the ALJ found at step two that plaintiff was not disabled on or prior to his date last insured, this claim of error at step five also is meritless.

## G.   Reversal is not warranted based on the Appeals Council's denial of plaintiff's request for review.

Plaintiff's eighth claim is that the Appeals Council wrongly refused to consider his appeal, and instead let the ALJ decision stand. (*See* ECF No. 5 at 4.)

The fallacy of this claim is that the Social Security Act only permits judicial review of the agency's "final decision." *See* 42 U.S.C. § 405(g). The Appeals Council's denial of a request for review is not a final decision; rather, such denial renders the ALJ's decision as the "final decision" of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000); 20 C.F.R. § 404.981. Thus, this Court lacks jurisdiction to review the Appeals Council's denial of plaintiff's request for review. *See Brewes v. Comm'r of Soc. Sec. Admin.*, 682

F.3d 1157, 1161 (9th Cir. 2012) ("We have held that we do not have jurisdiction to review a decision of the Appeals Council denying a request for review of an ALJ's decision, because the Appeals Council decision is a non-final agency action."); *Taylor*, 659 F.3d at 1231-32 (holding that a reviewing court may review additional evidence submitted to and rejected by the Appeals Council, but may not review an Appeals Council decision denying a request for review); *see also Luther v. Berryhill*, 891 F.3d 872, 876 (9th Cir. 2018) ("[T]he Appeals Council's reasoning for denying review is not considered on subsequent judicial review.").

**H.**     **Plaintiff's subsequent award of SSI benefits does not warrant reversal of the ALJ's decision or warrant remand for further proceedings pursuant to 42 U.S.C. § 405(g) (Sentence Six).**

According to plaintiff in his Reply Brief filed on December 18, 2018, at some unspecified time apparently subsequent to the ALJ's decision in the instant case, he applied for SSI and was sent by the SSA for a consultative examination by a psychologist, who found plaintiff disabled at some unspecified time. As a result of the psychologist's report, plaintiff was awarded SSI benefits, which he had just started to receive. Plaintiff claims that the award of SSI benefits "should now be applied to pass through" to his claim for disability insurance benefits. (*See* ECF No. 19 at 2.)[7]

_____

[7]     Although plaintiff has not proffered any evidence of his SSI application, the supposedly favorable psychologist report, or the ALJ decision awarding plaintiff SSI benefits, the Commissioner responded to this claim in her cross-motion/opposition to plaintiff's summary judgment motion by acknowledging that Social Security records show that plaintiff applied for SSI on June 2, 2016; that, in a hearing decision dated September 6, 2018, an ALJ found plaintiff disabled as of September 7, 2016, based in part on findings from a psychiatric examination that day; and that the ALJ acknowledged in his decision that plaintiff's previous application for disability insurance benefits was denied by ALJ decision of May 6, 2016, and explicitly stated that the subsequent claim did not invade the previously adjudicated period, which was final and binding. (*See* ECF No. 27-1 at 28.) In

The fallacy of this claim is that the Court lacks jurisdiction to reverse the Commissioner's decision based on evidence that is not part of the administrative record. *See* 42 U.S.C. § 405(g) ("The court shall have the power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Here, neither plaintiff's SSI application, nor the ALJ decision awarding plaintiff SSI benefits, nor any of the evidence underlying that decision is part of the administrative record before the Court.

Section 405(g) does confer on the Court jurisdiction to remand the case to the Commissioner for the consideration of new evidence, but "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See* 42 U.S.C. § 405(g) (Sentence Six); *Allen v. Secr'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984). The good cause requirement is satisfied if new information surfaces after the Commissioner's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding. *See Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985). To be material, the new evidence must bear directly and substantially on the matter in issue, and there must be a real possibility that the new evidence would have changed the outcome if it had been before the Commissioner. *See Cotton*, 799 F.2d at 1408; *Booz v. Secretary of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1984).

Here, if plaintiff had proffered evidence of the ALJ's September 6, 2018 decision finding plaintiff entitled to an award of SSI benefits, the Court would have found such evidence new and further would have found good cause for plaintiff's failure to incorporate such evidence into the record earlier. *See Burton v. Heckler*, 724 F.2d 1415, 1418 (9th Cir.

_____

his Reply to the Commissioner's opposition, plaintiff does not dispute any of the foregoing representations by the Commissioner concerning his SSI application. (*See* ECF No. 29.)

1984) (noting that the good cause requirement is met when the new evidence "did not exist at the time of the ALJ's decision").

However, plaintiff has not even purported to make the requisite showing that the evidence of the award of SSI benefits (or any of the evidence underlying that decision) bears substantially and directly on the matter in issue, named whether plaintiff was disabled on or before September 30, 2013, his date last insured. *See Armstrong*, 160 F.3d at 589 (citing 42 U.S.C. § 423(c)). And, based on the Commissioner's uncontroverted representations regarding the ALJ's September 6, 2018 decision finding plaintiff entitled to an award of SSI benefits, the Court fails to see how plaintiff could possibly make such a showing. According to the Commissioner, the ALJ found plaintiff disabled as of September 7, 2016; and, after acknowledging in his decision that plaintiff's previous application for disability insurance benefits was denied by ALJ decision of May 6, 2016, the ALJ explicitly stated that the subsequent claim did not invade the previously adjudicated period, which was final and binding.

In *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010), the Ninth Circuit found that remand for further administrative proceedings under Sentence Six was appropriate where a favorable decision that was issued in close proximity to an initial denial could not be easily reconciled from the record before the court. Here, by way of contrast, the subsequent favorable decision on plaintiff's SSI application was not issued in close proximity to the relevant date for purposes of plaintiff's application for disability insurance benefits (*i.e.*, September 30, 2013). Rather, it was issued nearly five years later. Moreover, here, the subsequent favorable decision was based on different medical evidence (*i.e.*, the subsequently obtained favorable consultative examination report) and involved a different time period. Thus, this case is governed by *Bruton*, 268 F.3d at 827, where the Ninth Circuit found that remand for further proceedings under Sentence Six was not warranted when the record reflected that a subsequent favorable decision involved different medical evidence and a different time period.

# RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, that the Commissioner's cross-motion for summary judgment be **GRANTED**, and that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within 14 days after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within 14 days after being served with a copy of the objections. *See id.*

IT IS SO ORDERED.

Dated: August 14, 2019

_____
ROBERT N. BLOCK
United States Magistrate Judge